Judge Underwood
delivered the opinion of the court.
On the 3d, of Sept. 1823, a capias ad satisfaciendum issued from the clerk’s office of the federal. court, fqr the 7,th circuit, Kentucky district, in favor of Allen andGfrant, as plaintiffs, against John Hanna, as defendant, returnable on the 1st Monday in December, following. In virtue of this writ', the marshal of the district took the body of Hanna, and committed him to the jail of Mercer county in this state. Some time in October, 1823, Hanna executed a bond,-with Moore, the plaintiffin error, as his surety, to Henry Eccles, jailor of Mercer county, conditioned, “that if Hanna well and truly kept and remained within the prison rules or bounds of the prison of Mercer- county, being the boundaries or limits of the state of Kentucky, and should not thence depart until discharged, by a due course of law, then to be void, &c.”
Leslie Combs, as attorney for Allen and Grant, on the 12th October, 1824-, gave Hanna permission, in writing “to leave the prison bounds of Kentucky, for twenty-five days, from and,after he makes application to the jailor, who took his bond for the bounds,. Said time to be marked on the bond, and absence for the twenty five days not to be considered as a breach of the prison rules.”
Provisions oT congress of V789 & 1791.
Hanna made no application to the jailor, for the purpose of entering on the bond the date of the commencement of his twenty-five days furlough. He Harrodsburg some time in October, and in December, 1824, was a resident citizen of the state of Tennessee, where he continued to reside up to the institution of this suit.
Eccles, the jailor assigned the bond, for the prison rules, to Allen and Grant, and they instituted suit thereon, in 1826, and recovered of Moore, judgment for a large amount-upon the alleged breach, that Hanna had violated the condition of his bond.
To reverse the judgment thus rendered,Moore prosecutes a writ of error with supersedeas.
The following questions are made and presented for consideration.
1st. Is the instrument declared an obligatory upon Moore?
2d. If it be, has Moore been discharged by the permission given Hanna to leave the bounds?
3d. If Moore is not so discharged, then it is urged that the declaration is defective?
The first question involves, to some extent, a eon-sideration of the operations of the national and state governments. The ca. so. against Hanna emanated from a national tribunal. In virtue of it, he was imprisoned in ajail belonging to the state of Kentucky, and transfered by the marshal, a national officer, to the jailor, an officer ofthe state. In September, 1789, congress adopted a resolution, recommending it to the legislatures of the several states to pass laws, making it expressly the duty of the keepers of their jails to receive, and safe keep therein, all prisoners committed under the authority of the United States, until they shall be discharged by due course of the laws thereof, under the like penalties as in the case of prisoners committed under the authority oí such states respectively, laws of the United States,vol. II. 75. In March, 1791, congress passed an act, providing, that, “in case, any state shall not have complied with the recommendation, the marshal in such state, under the direction of the district judge, shall be au- *614 ihorized to hire a convenient place, to serve asa tent porary jail, and to make the necessary provision for the safe keeping of prisoners committed under the authority of the United Stains, until permanent provision shall be made by law for that purpose.”
By the statutes of Ky. 1798 & 1800,2 Digest 679, Marshal of theU.S. vested with the privilege of vising the jails of the several counties.
.Statutes of 1796 & 1822,2 Dig. 1046. establishing and extending prison rules,
In 1800, congress gave to persons confined by process from the U. S. courts, the same privileges of the prison limits enjoyed by those confined by state process, Laws U. S'Toi- 3’ 301,
*614 By an act of the general assembly of Kentucky, passed in 1798, it was made theduty of the jailors and keepers of jails, belonging to the state, to receive prisoners committed under authority of the United States, and to keep them according to the warrant of commitment, until discharged “by the due course of the laws of the United States,” II. Digest, 679. By another act passed in 1800, (see same page of the Digest,) the marshal, for the court of the United States, within Ibis state, has a right to use any county or district prison, for the imprisonment of any one in his custody, by writ or process, in the same manner as the sheriffs of the respective counties have a right to uso such prisons, “and all jailors and keepers of jails within this commonwealth are directed to receive and keep such prisoners delivered them by the marshal or liis authorized deputy, in the same manner as if the prisoner were delivered to him by the sheriffof the county in which his jail is fixed.”
By an act of 1796, I. Digest, 1046, every prison - er, not committed for treason or felony, was entitled, for the preservation of his health, to the benefit of the prison rules or bounds, upon giving good security to keep within them. In 1822, (same page Digest) the prison rules or bounds were extended to the limits of the commonwealth. Previous to this time, they were confined to ten acres, to belaid off by the justices of the several counties, within their respective counties, I. Littell’s laws, 376.
In January, 1800, congress passed an act giving to persons imprisoned, on a process issuing from any court of the United States, the like privileges of the yards or limits of the respective jails, as persons, confined in like cases on process from the courts of the respective states, are entitled to, and under the like regulations and restrictions; laws of the United States, vol. III. 301.
The same act prescribes the course to be taken in order to liberate, from imprisonment, those who are *615 insolvent, ft is made the duty of the marshal of any district to execute, throughout his district, all lawful precepts directed to him, and issued under the ity of the United States5 laws of the United States, vol. II. 66. By the 9th section of an act of congress, of 1795, marshals are invested with the same powers in executing the laws of the United States, as sheriffs exercise with respect to the laws of a state; laws of the United States, vol. II. 481.
The duty of jPr®“ u. 8. II v. 66 & 481.
By the provi-had a tight to sue out a casa, ny judgment whore such ”0”, a hi o' ¡ni dependent of the restrictive ^eTu^eme^ COUrt.
The acts of congress, and of the general assembly of Kentucky, referred to, present every thing to be found in the statutory codes of the nation and state, which can bear upon the question under consideration. It has been said in argument, that there was no law in forcé in 1823, when the ca. sa. against Hanna issued, tolerating his imprisonment under such a writ. Without stopping to enquire minutely, into the correctness of this position, we will barely remark, that the first act of congress, which passed to regulate process in the courts of the United States, required, that “the forms of writs and executions, except their style, and modes of process in the circuit and district courts in suits at common law, shall be the same in each state respectively, as arenow used or allowed in the supreme courts of the same.” ' This act was limited in its duration. But the foregoing provision was, in substance, made perpetual, by aü act of 1792; laws of the United States, vol. II. 299, sec. 2. This latter act, however, modified the former, by subjecting writs, executions, and other process to such alterations and additions, as the federal courts, respectively, in their discretion, might deem expedient, or to such regulations, as the supreme court of the United States might think proper, from time td time, by rule, to prescribe to any circuit or district court concerning the same. This act contains a proviso, giving the plaintiff aright tosue out a ca. sa in the first instance on any judgment, where that process was allowable, and to this extent it secured to the plaintiff a right to use the ca. sa. in' a manner independent of any restricting regulation, which the supreme court might have been disposed to adopt.
If these acts of congress adopted the writs and processes known, used and allowed, by the supreme *616 courts of the states, at the time of their passage, as "'Ñ-8 anc* processes to be used by the federal tribunals, subject to such alterations and additions, as be made in them, under the act of 1792, and not 8UbjeeL to the changes which might thereafter be made in them by the legislatures of the states; then-, as the ca .sa. was allowed, by the laws of Kentucky, all[¡ iler supI>eme court, at the dates of the said acts congress, (regarding Virginia as the representative of Kentucky, which in fact had then no separate cx-¡stence,) it would follow, that the act, abolishing aca* P*as satisfaciendum passed by the legislature of Kentucky, in 1321, did not effect the right of Allen and Grant to sue out that writ from the federal court, * ’ m 1823. It has been an agitated question, whether congress could; constitutionally, invest the federal C0U!ts with power to modify, change, and alter its process at pleasure. However that may be, we are strongly inclined to the opinion, that Congress could not, constitutionally, vest the legislatures of the several states with power to prescribe laws, rules, and regulations, for the government of the national tribunals, or the officers of the national government. The adoption of an existing system, on the part of congress, by wav of reference to it, and thereby making it the law of congress, is a very different thing from that of- saying, whatever is prescribed by another body of men, or a single man, shall be law, when promulgated, even though it should operate to repeal an existing statute, ,
■Power of existin' laws of the states rales of gov-ernmeut for tribunals, by reference and the power of changing and modifying these rules to the state authorities, dis--sedanes.
‘Flie court not at liberty to legality1 of ° to'™Hsfn in* Virtue of casa, emarc^ing nXveiwhich U has no cou-
*616 That legislative powers may he delegated to some extent, as to corporations, limiting (.hem by the general system of laws, constitutional and statutory, in force, may lie true. It may likewise be true, that a power to suspend the operation of laws may be delegated. But it would be a dangerous doctrine, to admit, that our national or state legislatures could delegate authority to any man or set of men, giving the right to repeal an existing system of laws, by substituting one entirely new and different’.
We are, in our opinion, not at liberty, in the present case, to investigate the legality of Hanna’s imprison-tftent in virtue, of the ca. sa., and to found, upon such an investigation? a decision against the validity of the *617 Instrument sued on, oven, were we, by the1 investiga'-lion, to arrive at the conclusion, that the ca.sa. issued without legal authority.
The ’exposi-pre^e coin?1* of the U. S. of an act of cfusfv^i&iT" the stats courts. ^
’fioty of jailor of igooS' to keep per ! son commit-ces/from t)™" u'^/oourt8 until dischar-sed according to the laws ot the U. s. Tol. ll1, 301 •
The emanation of that writ was the act of a tribunal over which this has no control, and if the act was. void, the injury, resulting from it, is pot now a queslipri further than it can be regarded as the foundation, to justify the jailer of Mercer county, in taking from * Ilanna and Moore, a bond to keep the prison bounds,
The supreme court of the United States has.decided, that a ca. sa. might lawfully be sued out from 'the federal courts in this state, notwithstanding our act abolishing the ca. sa. See Bank United States vs. January, X. Wheaton. Their decision in this respect is undecisive. The exposition of acts of congress belongs, according to the structure of our complex government, to the federal courts; and whfeni settled by the adjudication of the supreme court, must be final and obligatory upon all. Otherwise,, the fundamental principles of the government will be disregarded, if not subverted, and’confusion, if not rebellion, will be the inevitable consequence. Regarding Hannahs imprisonment as legal in virtue of the ca. sa„ we shall proceed to enquire, whether, the .jailor of Mercer had any authority to take the bond, upon which the judgment has’been rendered against Moore.
By the Kentucky acts of 1798, and 1800, the jailer of Mercer was made the keeper of Hanna upon his commitment, It was his duty under these, acts, to keep him until he ,was discharged by fthe due course of the lam of the United, Stales.” Wjjfe-was to be the judge, as to the manner of the dischtrSge, afid how it was to be effected ? Do the laws of tfyg United States, any where indicate, that the jailor shall be -jo J the judge?
There are two modes contemplated by the acts of Congress, in which a debtor prisoner may be released from the walls of the jail, and only two. One is the certificate of a federal judge, or two commissioners, appointed by the judge, to administer the oath of insolvency to the prisoner, stating the. fact, that the oath has been taken; upon the production of which» *618 the prison keeper is not only bound to release tbe prisoner from the walls of the prison, but he is to be completely discharged from imprisonment. See Laws U. S. Vol. III. 301. A glance at the provisions of this act will convince any one, that the jailor can exercise no discretion, and that he has no controul oyer this mode of the prisoner’s release or discharge.
Marshal of the U. S. is to the U. States ■courts, what the sheriff is to the state courts-; his duty to take prison bounds bond, approve the security and instruct the jailor to allow the prisoner the rules or limits ofthe prison. The •statutes of By. of 1812 & 1822, do not affect the act of congress of 1800, nor substitute the jailor for the marshal, nor the prison bounds of 18-22 for those »'lowed when gressof 1800 passed,
*618 The other mode contemplated by the acts of congress, for the easement of a prisoner, does not au-‘ thorize an entire discharge from imprisonment. It merely releases him from the walls of the jail, by granting the privilege of the prison yard, or bounds. How is this privilege to be secured to the prisoner?By the aforesaid act of Congress, of 1800, it is to be effected under the “like regulations and restrictions” as are applicable to persons confined “in like casesr on process from the courts of the respective states.” At the date of this act, persons imprisoned for debt, under the laws of Kentucky, could obtain the privilege of the prison bounds, extending to ten acres, by-executing bond with security to the sheriff in whose custody he might be.
Tlie marshal of the district under the acts of Congress is to the federal courts, what the sheriff is to the state courts. By the Kentucky act of 1800, the jailor is expressly directed to receive and keep prisoners delivered to him by the marshal, in the same manner as if delivered by the sheriff. The only just interpretation, of which these acts are susceptible, with a view to extend the benefit of the prison rules to a debtor confined under a ca sa from the federal court for the district of Kentucky, is, that the marshal must take the bond, appf-ove of the security, and direct (he jailor to grant or allow the prisoner the benefit of the yard or bounds. There is much pro-’ priety in this, because of the relation which the marshal bears to the court whence the ca sa issued, to the plaintiff in tbe execution, and to the defendant, committed by him to the custody of the jailor.
Thus stood the law up to the ‘passage of the act of 1812, II. Dig. 678, which first gave jailoFS authority to take bonds for the prison rules, and but for this act there would be no pretence for contending that the jailor had authority to take the bond in the present" *619 instance, fixing therein, the bounds according to the Kentucky act of 1822, instead of ten acres, as allowed by the laws of the state when the act of congress of 1800 was passed. Does this act of 1812 constitute the jailor an officer of the federal courts, for the purpose ot releasing their prisoners from close confinement, by giving them the benefit of the bounds? We think it does not, for several reasons. There is nothing to be found in any act of congress, which for a moment can warrant such an opinion, unless it be the expression in the act of 1800 which provides that the privileges of the yards or limits of the respective jails shall be extended, to prisoners ’•’•under the, like regu-lotions and restrictions,” as in cases of commitments on process from the courts of the respective states.
All that is intended by this provision is, to adopt the regulations and restrictions of the states, as rules for the conduct of the officers of the federal government, and cannot be construed so as to adopt state officers, and to vest them with power to administer and apply the laws of congress, or the laws or rules of the federal courts. Consequently, the jailor of JVIer^ cer did not derive any authority from this act of congress to extend the prison limits to Hanna.
But again, all the power the jailor possesses, is derived from the Kentucky act of 1812. Can this act be so connected with the act of Congress of 1800 as to constitute the jailor an officer for the federal government, and to give him power to discharge her prisoners? If by the connexion of the state act of 1812, with that of congress of 1800, the jailor may grant the prison limits, by taking bond with security, to one committed by the federal tribunals; what would prevent a justice of the peace under J;he third section of our act of 1821, abolishing the ca sa, I. Dig. 503, from ordering the jailor to discharge all prisoners confined for debt under process from the federal courts?
If the expressions, “like regulations and restrictions as used in the act of Congress of 1800 can attach to. the subsequent Kentucky act of 1812, so as to give the jailor power, there is equal reason for making them attach to the-act of 1-821, so as to give a justice *620 of the peace power to discharge entirely the prisoners °f the federal courts, and thus the absurdity would" that instead ot their being discharged by the “due course of the laws of the United States,n administered by her officers, they would be discharged by our state officers, in pursuance of the provisions of our stale laws, passed subsequent to any act of congress on the subject, and which state laws have never been recognized or adopted by the legislature of the nation. Suppose the state of Kentucky had not granted the use of her jails to the general government, the marshal of the district would then, under the act of 1791, have hired, or provided a convenient place for a temporary jail. Could our state officers interfere in any respect to give prison limits or to discharge those legally confined under process from the federal courts in such temporary jail? Certainly not.
The jailor of noTautboriz-cd by the acts of congress to for keeping the prison° limits, from a edbonVprocess issued from the uTs^heis but the turn-keyofthe persmoeoCthe prisoner without judicial ary power.0"'
When the state, through courtesy to the nation, has offered the use of her jails, did she reserve to herself, or to her officers, the right, in any respect, to control the prisoners of the nation committed to them? She did not,
The tenor of our acts of 1798 and 1800, makes our jailors, in respect to the prisoners confined under ¿he authority of the nation, mere turnkeys, and exacts fr°m United States payment or hire, for the use of our jails, and requires that the prisoners of the United States should be supported at the expense of ^le natI°n» or of • her marshals. The conclusion is satisfactory to our minds that Eccles, the jailor, had no authority to take from Hanna a bond for the prison bounds,.he being a prisoner under process from the federal court.
Is the bond a good common law obligation? It may be said that the cases of Stevenson vs. Miller, If. Lit. S10; and Hay &c. vs. Rogers, &c. IV, Mon. 226, wou^ support this bond. We think they are not in point, because in the present cas§, the law' made it the duty of the jailor, Eccles, to keep Hanna safely *n jaIR and he had no authority to give him the bounds or prison rules, even to.the extent of ten acres, much less the whole state. As an officer, he accepted the bond as the price for a violation of his duty, and *621 consequently, be or his assignee, cannot be tolerated in recovering upon it. The case of Mitchell vs. Vance, &c. V. Mon. 528, in principle bears upon this. It is laid down in Bacon’s Abridgment, title sheriff, letter O, that the condition of an obligation to save the sheriff harmless, on his admitting persons to bail, who are not bailable by law, is void by the common law.
4 bond taken by an officer aot w¡,i0h he isnotnutho-riz®<1 ,t0 1)0 bJ fate qfficeii is void,asacom-,non law bonfl operative^osa statutory boncl-
It may be seen under the same head, that bonds given by prisoners for ease and favor to those who have them in custody, and who are not by statute authorized to take such bonds, are void at common law. We believe the jailor had no authority to discharge Hanna, by taking the bond in the present case. If he could take upon himself to give the limits of the state to Hanna, by applying the act of Kentucky, extending the prison bounds so far, the same reason would justify him in turning loose all the prisoners confined under authority of the United States, lawfully committed by them, if in the opinion of the jailor, the legislation of the state authorized it. This cannot be correct. So long as the states give the use of their jails to the nation, state jailors must keep national prisoners until discharged by national officers, in pursuance of the laws of the United Slates. The laws of congress have not adopted the extension of the prison bounds, nor have they constituted state jailors national officers, for any purpose.
We do not intend to' impute moral turpitude to the jailor. On the contrary, we readily admit that he may have been honestly influenced by mistaken views of his duty, in extending the act of 1812, by. the construction placed upon it, so as to give him authority over the prisoners of the United States.
We regard the bond as void upon its face, for it exhibits all the facts, and therefore, judgment ought: .to have been rendered upon the demurrer for the defendant. This conclusion supercedes the necessity of investigating the other questions presented, and as this opinion is already long, we shall decline going into a consideration of them.
The judgment of the circuit court is reversed, and the cause.remanded, with directions to render judg *622 merit in favor of the plaintiff in error, upon his do murrer *° declaration. The plantiff in error must recover his costs in this court.
Monroe, Chinn, and Owsley, for plaintiff; Wickliffe’ Woolley, and Combs, for defendants.
The chief justice dissents, and the foregoing opinion is delivered by the concurrence of the other judges.